James QUISENBERRY, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

and

Kenneth Williams, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2009–SC–000302–MR, 2009–SC–000418–MR.

Supreme Court of Kentucky.

March 24, 2011.

V. Gene Lewter, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant, Quisenberry.

Daniel T. Goyette, Louisville Metro Public Defender, Cicely Jaracz Lambert, Assistant Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant, Williams.

John Conway, Attorney General, Jeffrey Allan Cross, Criminal Appellate Division, Office of the Attorney, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Kenneth Williams and James Quisenberry appeal as of right from Judgments of the Jefferson Circuit Court sentencing them, respectively, to life and to forty-five years in prison for their roles in the robbery and murder of Earon Harper and the shooting of Harper's two-year-old daughter, Erica. The two men were tried jointly. At the conclusion of the two-week trial, the jury found both of them guilty of robbery and, as to Earon Harper's death, found Williams guilty of murder and Quisenberry guilty of second-degree manslaughter. The jury further found Williams guilty of assaulting and attempting to murder Erica, Quisenberry guilty of facilitating those offenses and both defendants guilty of tampering with physical evidence. Finally, the jury found Quisenberry guilty of being a second-degree persistent felon, but declined to enhance his sentence recommendation on that ground. Because of the joint trial and the common underlying facts, we have consolidated the two appeals for consideration in a single opinion. Williams contends that the trial court erred (1) by refusing to order separate trials; (2) by failing to instruct the jury concerning the proper use of statements the defendants gave to police; and (3) by refusing to suppress Williams's own statement, allegedly obtained in violation of *Miranda*. Quisenberry contends that the trial court erred (1) by denying his motion for a directed verdict of acquittal on all charges and (2) by imposing cumulative punishments for the facilitation of assault and facilitation of attempted murder offenses. Finding no reversible error, we affirm in both appeals.

### RELEVANT FACTS

Construing the evidence in the light most favorable to the Commonwealth, on

the afternoon of May 18, 2006, Earon Harper's landlord stopped by Harper's rental home, on Wilson Avenue in south Louisville, found an open, empty purse lying on the walk leading to her door, and found the door ajar. When Harper did not respond to his knock, he entered the home and discovered Harper's body lying on the floor between the front room and a bedroom. In the bedroom, he found two-year-old Erica lying on the bed, badly wounded and moaning in pain. The landlord called 911, and the first officers to respond immediately transported the child to the hospital.

The medical examiner testified that both victims had been shot at least two times. Harper was shot once in the right thigh and once from just a few inches away, near the left ear. The examiner could not determine the order of the shots, but he testified that the shot to the head would have been instantly incapacitating. Erica was also shot once in the thigh, a piercing shot that entered and exited the thigh, and shot again in the left forehead. As with Harper, the examiner could not determine the order of the shots. The shot to the head was from within two feet, and the bullet appeared to have passed downward through the child's head, out her jaw, into her chest, and out her right flank. The chest-to-flank injury, however, could have been the result of a third shot. Somehow Erica survived those injuries, but she was left blind in one eye.

Louisville Metro Police Department (LMPD) investigators recovered bullets and shell casings from the scene, and ballistics testing determined that all of them had been fired from a 9mm firearm, with the bullets from the same gun and the casings from the same gun. Investigators also found cigarette butts and soda cans in the bedroom. DNA analysis determined that a DNA sample recovered from one of

the cigarettes matched a sample taken from Quisenberry, and a sample recovered from one of the soda cans matched a sample taken from Williams. The investigators found empty prescription bottles in Harper's name strewn about the bedroom floor and, in the bedroom closet, they found a small safe which had been opened, with its main compartment empty.

Phone records showed that shortly after midnight on May 18, 2006, hours before Harper's body was discovered, Harper received two brief calls from a number registered to Quisenberry. Those records led investigators to interview Quisenberry on June 6, 2006. At that interview Quisenberry admitted that the phone number was his, that he and Harper had known each other for several years, and that their relationship included the exchange of prescription medications. He did not tell the investigators that he had been in Harper's house later that morning of May 18th.

Through testimony by a pharmacist and excerpts from the surveillance video at the Walgreens pharmacy where he worked, the Commonwealth established that during the evening of May 17, 2006 two persons resembling Quisenberry and Williams came to the pharmacy's prescription window. Although the men were unsuccessful in their attempt to obtain prescription medicine, the jury did not hear this, only that the men were at the pharmacy window. Soon thereafter the pharmacist discovered that the owner's manual, registration, and insurance certificate had been stolen from his car. A few days later, in response to a citizen's report, a police investigator found those items belonging to the pharmacist in a catch basin not far from Harper's home along with Harper's driver's license, various bank and shopping cards issued in Harper's name, and empty prescription bottles also bearing Harper's name.

Key to the Commonwealth's case was the testimony of Rashon Turner, a long-time acquaintance of both Quisenberry and Williams. Facing unrelated murder charges of his own, in July 2007 Turner agreed to testify against his former friends in exchange for a favorable plea bargain. Turner told investigators, and later testified at trial, that early one morning "a couple of weeks after the Derby" in 2006, he was on the porch of Williams's mother's house visiting with Williams's brother, when he received a phone call from Williams, who claimed to have just "hit a lick," *i.e.*, committed a robbery. A short time later Quisenberry dropped Williams off at the house, and Williams told Turner that he and Quisenberry had gone to the home of a woman Quisenberry knew on Wilson Avenue to get some pills. According to Turner, Williams, in the course of taking the woman's purse away from her grasp, had shot her two times and then had shot another person. Williams showed Turner some pills and a black, semi-automatic, 9mm handgun. He also stated that he had discarded some papers and other items while he and Quisenberry were still in south Louisville. Turner believed that Williams later sold the gun.

Armed with this information, on August 29, 2007, LMPD investigators interviewed Williams and reinterviewed Quisenberry. Both initially denied having been at Harper's house the morning Harper was killed, but eventually, convinced that the police had proof of their presence, each admitted having been there; having seen a black, 9mm gun; and having heard gunshots. Quisenberry acknowledged having been present when Harper was shot in the leg, and he recalled at least three or four shots. Williams recalled that Harper was on the ground when she was shot, and he also remembered hearing Erica crying from the bed. Their statements, paraphrased by the testifying police detective

so as to exclude any reference to each other, were admitted at trial. The detective was also permitted to testify on cross-examination that both defendants denied having shot either Harper or her daughter, Erica.

Neither defendant testified at trial, but Williams attempted to discredit Turner's testimony by calling his, Williams's, younger brother, who denied having had the alleged post-Derby conversation with Turner on his mother's porch. Otherwise, each defendant's defense was essentially designed to establish that he was not the one who fired the shots. The jury instructions reflected those defenses through complicity and facilitation charges. As noted, the jury attributed the major role to Williams, finding him guilty of murdering Harper and of assaulting and attempting to murder Erica while finding Quisenberry guilty of second-degree manslaughter and of facilitating the crimes against the child.

### ANALYSIS

### Commonwealth v. Kenneth Williams— 2009–SC–000418–MR

Williams's first contention on appeal is that he was entitled to be tried separately from Quisenberry and that the joint trial was rendered unfair by the use of their paraphrased statements to police. The detective's paraphrase of Quisenberry's statement, Williams maintains, directly implicates him, Williams, in the crimes, and because Quisenberry did not testify and so could not be cross-examined, the use of the incriminating statement deprived him of his right under the Fifth Amendment to the United States Constitution to confront the witnesses against him. Williams also maintains that the trial court erred by not *sua sponte* instructing the jury to limit its consideration of Quisenberry's statement

to its determination of Quisenberry's guilt or innocence.

## I. The Introduction At Trial Of Portions of Both Defendants' Pretrial Statements To Police Did Not Result In Prejudice Such That The Trials Should Have Been Severed.

### A. The Defendants' Statements Were Adequately Redacted.

As we recently reiterated in *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky.2009):

Rule of Criminal Procedure (RCr) 6.20 permits the joinder for trial of two or more defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Joint trials are a mainstay of our system, as they give the jury the best perspective on all the evidence and thus increase the likelihood of proper verdicts and avoid the possibility of inconsistent ones. Conflicting versions of what happened, we have thus noted, "is a reason for rather than against a joint trial." ... RCr 9.16, on the other hand, requires that trials be severed "if it appears that a defendant or the Commonwealth is or will be prejudiced" by the joinder.

*Rodgers*, 285 S.W.3d at 745 (quoting from *Shepherd v. Commonwealth*, 251 S.W.3d 309, 313 (Ky.2008)). We review the trial court's denial of a motion to sever for abuse of discretion, *Shepherd*, and the burden is on the appellant to show that the denial was in fact unfairly prejudicial. *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky.2009); *Bratcher v. Commonwealth*, 151 S.W.3d 332 (Ky.2004).

As Williams correctly notes, in a joint trial, the Confrontation Clause of the United States Constitution precludes "the pretrial confession of one [defendant from being] admitted against the other unless the confessing defendant takes the stand." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *see also Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding more generally that testimonial hearsay is inadmissible if the declarant is not available to testify and the defendant has not previously had the opportunity to cross-examine the declarant). The pretrial confession may not even be admitted against the confessor, moreover, if on its face it implicates another defendant being jointly tried with the confessor. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). The Supreme Court has held, however, that the Confrontation Clause does not rule out either joint trials or the use therein of pretrial confessions against the confessors themselves. To be admissible though, the codefendant's confession must be redacted so as to remove express and obvious inferential references to the defendant: "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702.

Citing *Bruton* and *Crawford*, Williams moved for a separate trial on the ground that the introduction of Quisenberry's August 29th statement would violate his, Williams's, right to confrontation. The Commonwealth proposed, pursuant to *Richardson*, to redact from Quisenberry's statement any reference to Williams and from Williams's statement any reference to Quisenberry, and the trial court ruled that with these redactions there was no need

for the trials to be severed. As the trial court noted, we have upheld the use of a codefendant's redacted statement for this purpose. *Shepherd*, 251 S.W.3d at 313–15.

Williams first contends that the trial court abused its discretion because the written redaction of Quisenberry's statement which the Commonwealth proffered in response to Williams's severance motion did not eliminate what, Williams maintains, were obvious references to him. Significantly, however, that written redacted statement was not read or otherwise introduced at trial. Whatever its inadequacies, therefore, the written statement did not prejudice Williams and so does not provide a ground for relief. Our focus is, as it must be, on what the jury actually heard.

At trial, the Commonwealth asked the detective to paraphrase what the two men had told him. In doing so, the detective scrupulously avoided any mention either defendant made of the other, limiting his testimony to what each defendant said about his own actions, about the two victims, and about his having seen a gun and heard gunshots. As noted, on cross-examination each defendant was allowed to ask whether he had denied shooting anyone, and in both cases the detective answered that he had. Williams contends that this paraphrased version of Quisenberry's statement violated his confrontation right because notwithstanding the fact that it does not refer to him expressly it does so by obvious implication. If Quisenberry saw a gun and heard gunshots, but was not himself the shooter, then clearly, Williams maintains, he is accusing Williams of filling that role. We disagree.

As Williams notes, in *Gray v. Maryland*, the Supreme Court held that a codefendant's confession redacted only to the extent of replacing each instance of the defendant's name with a blank or with the word "deleted" was inadmissible under

*Bruton* because in each instance the jury was virtually certain to understand. that the deletion referred to the defendant. Even redacted, therefore, the confession remained inculpatory of the defendant on its face and thus was so similar to the unredacted confession in *Bruton* as to warrant the same result. In *Richardson v. Marsh*, however, the Court upheld the admission of a codefendant's confession notwithstanding the fact that in conjunction with other evidence introduced at trial the confession became inculpatory of the defendant. The confession had been redacted so as to eliminate any direct or obvious reference to the defendant. Noting the vital roles that joint trials and confessions play in our criminal justice system, the *Richardson* Court explained that a codefendant's confession such as this, one incriminating of the defendant not on its face but only by inference when linked with other evidence, did not pose the same risk the facially incriminating confession in *Bruton* did of confounding an instruction that the jury is to consider the confession only against the confessor and not against the defendant. Accordingly, as noted above, the Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702.

While this case falls somewhere between *Gray* and *Richardson*, we believe that it is more like the latter than the former and so agree with the trial court that the joint trial and the admission of a paraphrased version of Quisenberry's redacted statement to police did not violate Williams's right to confrontation. Unlike the confessions held inadmissible in *Bruton* and

*Gray,* Quisenberry's statement did not expressly or in any way directly refer to Williams. It was clearly focused, rather, on Quisenberry's own role in the events at issue. To be sure, Quisenberry's admission that he heard shots and his denial of having fired them imply that someone else did, but the inference that Williams was "the someone else" is not suggested by the redacted paraphrase of Quisenberry's statement. It instead arises only by inference upon consideration of the other evidence of Williams's involvement (*e.g.,* Turner's testimony and the DNA evidence) admitted at trial. That sort of inferential linkage is *not improper* under the Confrontation Clause, but may, as the Court held in *Richardson,* be addressed in a limiting instruction. The joint trial did not unduly prejudice Williams, therefore, and the trial court did not abuse its discretion by denying his motion to sever.

**B. The Lack Of An Instruction Limiting The Jury's Use Of Quisenberry's Statement Did Not Render Williams's Trial Manifestly Unjust.**

■ This brings us to Williams's final contention with respect to Quisenberry's statement, which is that even if the statement was adequately redacted it should not have been admitted in the absence of an instruction or admonition limiting the jury's consideration of it to Quisenberry. Neither defendant requested a limiting instruction in this case, but Williams maintains that the trial court erred by failing to give one *sua sponte.* He acknowledges that in *Barth v. Commonwealth,* 80 S.W.3d 390 (Ky.2001), we held that a limiting in-

struction in this context is required only upon request, but he urges us to reconsider that holding. However, even if we were to revisit *Barth* and conclude that the trial court erred by failing to give a limiting instruction *sua sponte,* the error was not preserved and Williams cannot establish that it was palpable. KRE 105(a) (providing that the failure to give an unrequested limiting instruction is reviewable only for palpable error), RCr 10.26 (providing that unpreserved errors may be reviewed under the palpable error standard).

In *Barth,* Justice Cooper analyzed *Bruton* and *Richardson,* noting that neither case addressed whether the limiting instruction could be waived by the defendant's failure to request it. Drawing on Kentucky[1] and federal precedent as well as KRE 105 in writing for the majority, he opined that waiver would occur without a specific request by the defendant. Some might question the observation in *Barth* that "[p]resumably, a confession properly redacted . . . would not incriminate the codefendant at all." 80 S.W.3d at 397. There is certainly merit to the argument that even a scrupulously redacted statement, at some level, is detrimental to a codefendant to the extent the confessor denies responsibility for criminal conduct because a jury may be inclined to shift that responsibility to the other person(s) on trial. This potential strengthens the argument for requiring a limiting instruction whenever the trial court admits a statement by any of the defendants on trial. Additionally, as Justice Johnstone noted in his concurring opinion in *Barth,*

---

1. *Barth* cites *Hall v. Commonwealth,* 817 S.W.2d 228, 229 (Ky.1991) *overruled on other grounds by Commonwealth v. Ramsey,* 920 S.W.2d 526 (Ky.1996), a case in which this Court held that the trial judge did not err by not admonishing the jury sua sponte that the defendant's acknowledgment that he was a convicted felon could only be considered for

any affect on his credibility. "Defense counsel should be free to make as little of the admission by defendant of a prior felony conviction *as possible. As a matter of trial strategy,* it may be decided that the admonition would only serve to emphasize the conviction . . ." 817 S.W.2d at 229.

80 S.W.3d at 404–405, the admissibility of a codefendant's statement as sanctioned in *Richardson* can, under the most straightforward reading of that case, be deemed to depend upon both proper redaction and a limiting instruction, with the absence of either creating a Confrontation Clause violation. So there is merit to Williams's contention that the limiting instruction should be given by the trial judge *sua sponte,* but even were we to abandon *Barth,* that would not provide Williams with the relief he seeks because, having not requested the instruction as this Court has repeatedly held a defendant must,[2] he is relegated to having the issue reviewed for palpable error, a high hurdle that he cannot clear.

■ To justify relief under the palpable error standard, an error must be obvious and serious and it also must have resulted in manifest injustice. *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky. 2005) "A court reviewing for palpable error must do so in light of the entire record; the inquiry is heavily dependent upon the facts of each case." *Id. citing United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Given the compelling circumstantial evidence linking Williams to these crimes, Williams's own admission of involvement, and Rashon Turner's testimony of Williams's confession to him, we are convinced that the admission of Quisenberry's redacted and paraphrased statement without a limiting instruction did not render the judgment against Williams manifestly unjust. *Cf. United States v. Vega Molina,* 407 F.3d 511, 520–21 (1st Cir.2005) (applying plain error standard to the failure to give an unrequested limiting instruction and finding no such error as to one defendant where there was a "mass of other evidence" of that defendant's guilt aside from the codefendant's statement; finding plain error as to a third defendant against whom the totality of the evidence was "noticeably thinner" and where the statement was misused by the prosecutor against that particular defendant in closing argument.)

■ Given the recurrence of this issue, we reiterate that when a properly redacted statement of a codefendant is to be presented to the jury, a limiting instruction should always be given upon the defendant's request. Moreover, while not required, there is certainly nothing inappropriate about the trial judge informing counsel of his or her intent to provide such admonition *sua sponte* absent an objection from the defendant or defendants for whose presumed benefit it would be given.[3] As the Commonwealth and several courts have noted, sometimes there are tactical benefits to foregoing an admonition from the bench that may draw undue attention to fleeting or perhaps ineffective testimony which otherwise would have little practical effect on the defendant's case. *See, e.g.,*

---

**2.** In *Caudill v. Commonwealth,* 120 S.W.3d 635, 659 (Ky.2003) and most recently in *Rodgers,* 285 S.W.3d at 746, this Court adhered to *Barth* and reiterated that in those circumstances a limiting instruction is required upon request. Despite this clear direction to defense counsel, once again no request was made to the trial court and, as the Commonwealth aptly notes, this decision may well have been a conscious strategic decision by trial counsel to not draw undue attention to the codefendant's vague statement. Williams had two seasoned trial attorneys, each with significant capital litigation experience, and undoubtedly aware of *Barth* and *Caudill,* even if *Rodgers* had yet to be decided.

**3.** This practice would avoid any question about whether the lack of a request is defense trial strategy. Declining a proffered limiting instruction would preclude palpable error review, the typical response when no instruction is given and the record is silent.

*Caudill*, 120 S.W.3d at 659; *United States v. Clark*, 989 F.2d 1490, 1500 (7th Cir. 1993). Trial counsel knows best whether a limiting instruction will be beneficial, given what the jury has heard or will hear in the course of the trial. Thus, Kentucky precedent leaves that important judgment call squarely within the trial ·counsel's sound discretion by recognizing the concept of waiver. If a limiting instruction is advisable, trial counsel is now well-informed of the requirement to ask for one.

## II. The Police Officers Did Not Violate Williams's Miranda Rights.

Williams also contends that the trial court erred when it denied his motion to suppress his August 29, 2007 statement. Suppression was required, he asserted, because the investigating officers obtained the statement in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following a suppression hearing at which both the transcript and video recording of Williams's interrogation were introduced along with the testimony of the detective who conducted most of the interview, the trial court ruled that Williams had been properly *Mirandized* and that his statement was the result of a knowing and voluntary waiver of his *Miranda* rights. Williams contends that the trial court erred by disregarding instances during the process, both before he was *Mirandized* and after, when he invoked his rights and when, accordingly, the questioning should have ceased. Although the trial court did not address the alleged invocations specifically, that court appears to have concluded that Williams's references to a lawyer and his apparent willingness at one point to be taken to jail did not amount to the unambiguous assertion of his rights that *Miranda* has been held to require. With that apparent conclusion, we agree.

In *Miranda*, of course, the United States Supreme Court "determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." *Edwards v. Arizona*, 451 U.S. 477, 481–82, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In furtherance of those rights, the Court held in *Edwards* "that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States*, 512 U.S. 452, 454, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Thus, "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458, 114 S.Ct. 2350 (citing *Edwards* ). In subsequent cases, however, the Court has explained that the *Edwards* prohibition on further questioning applies only to unambiguous requests for counsel (*Davis* ) and unambiguous assertions of the right to remain silent (*Berghuis v. Thompkins*, ––– U.S. –––, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098, (2010)). A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. If, on the other hand, "a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459, 114 S.Ct. 2350. The same standards apply to assertions of the right to remain silent. *Berghuis*, 130 S.Ct. at 2259, 2260.

Williams and Quisenberry were both summoned to LMPD headquarters during the afternoon of August 29, 2007. Williams's questioning took place in a room equipped for that purpose with audio and visual recorders. The recorded interview commenced at about 4:30 and lasted slightly more than an hour and a half. Detective Arnold, the lead detective on the case, did most of the questioning, but he was sometimes joined by Detective Brown. At the outset of the recorded interview, Detective Arnold introduces himself to Williams, explains briefly that he is investigating the murder of Earon Hughes, and then informs Williams of his *Miranda* rights. He tells Williams of his rights to remain silent and to have an attorney, tells him that he may invoke those rights at any time during the questioning, and tells him that his volunteered statements can and will be used against him. Williams concedes that these warnings satisfy the *Miranda* requirements. Having received them, Williams proceeded to waive his rights and to submit to questioning. The trial court found, and Williams does not seriously dispute, that Williams's waiver was both knowing and voluntary.

■ Before Williams signed the waiver form and agreed to be questioned, however, the following exchange took place:

Det. Arnold: If you understand it [your rights] just sign right there, sign your name. I'm gonna sign here as a witness. We're just talking. I know we uh, I know we are, I'm just. And you can stop at any time.

Williams: This, this is what I'm saying brother, you just told me I had to (inaudible) ... So, you just ready to ask me some qu ... But, you told me I was ready to go to jail. This is what you told me.

Det. Arnold: I told you you were in custody, that's correct.

Williams: I'm talking about you told me I was ready to go down for a murder. That is what you told me.

Det. Arnold: That's not what I told you.

Williams: That's exactly what you just t ... that's, that's the only reason I said lawyer. When you said, when you asked me for my attorney.

Det. Arnold: No.

Williams: You said, you was like, "You ready, you ready to be charged with murder?"

Det. Arnold: No, I did not, uh-uh. I, there's, when I walked in you asked me what you're here for, and I said a murder investigation.

Williams: And, you said ...

Det. Arnold: No.

Williams: And, okay, and then what'd you say? You said, "You're not going nowhere, you going ...."

Det. Arnold: Is ... and you said, "Am I gonna go to jail?" I said, "you're not leaving here." That's correct.

Sgt. Brown: Dude, you're in custody right now, on HIP [home incarceration program].

Williams: I, I know that.

Det. Arnold: That's what I'm saying.

Sgt. Brown: You're, you're in our, we're responsible for you right now.

Williams: Aw, I didn't know; I didn't understand.

Sgt. Brown: Yes, and we're responsible for you.

Williams: Okay.

Det. Arnold: It's nothing personal here.

Williams: I know.

Det. Arnold: Kenneth, I just, you had, when I walked in you said, "Yeah, what am I doing here?" That's when I said, "I'm a homicide detective. I'm investigating a murder." And, you said well

what am I here for? I said, well it's in reference to this murder case. And you said, "Am I in cus ... ?" Or you said, "Am I going to jail?" I said, "You're not going anywhere right now." That's correct.

Sgt. Brown: Because you're on HIP. So, do you want to talk to us about this?

Williams: I'm a ... What y'all wanna know?

Sgt. Brown: All right. Well, go ahead and sign that.

Det. Arnold: And, if you want to stop at any time, it says that you can stop at any time. You can talk to me as long as you want, or as short as you want.

Williams: Okay, all right. So, I'm signing; I'm signing this to talk to y'all, to give y'all permission to talk without my lawyer, right?

Det. Arnold: Correct, right. Because I can't talk to you until you sign this.

Williams: Okay. So where do I sign?

Det. Arnold: You sign right here. And I'm gonna put my name as a witness. And, you do understand this, correct?

Williams: Yeah, I understand it and all.

Williams maintains that this passage shows that before the recorded interview began he invoked his right to counsel and that under *Edwards,* accordingly, he should not have been questioned at all. At most, however, the passage indicates that before being questioned Williams "said lawyer,'" not that he unambiguously requested an attorney. At the suppression hearing, Detective Arnold testified that in their brief exchange prior to questioning Williams did not ask for counsel. Given that testimony and the recording which is, at best, ambiguous, the trial court did not err by ruling that Williams's interrogation was not precluded by a pre-questioning request for an attorney.

Williams also asserts that his reference at the beginning of his interview to his pre-interview "lawyer" remark was itself a request for counsel, but as discussed above, *Edwards* requires more than the mere mention of the word "lawyer." An officer could reasonably have understood Williams's remarks prior to signing the *Miranda* waiver not as a request for counsel, but as an attempt to determine whether the police had decided to charge him with murder and put him in jail. Because Williams's remarks did not constitute an unambiguous request for counsel, the *Edwards* prohibition on further questioning did not arise. Nor does *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), afford Williams any relief, since clearly this is not a case in which the officers postponed giving the *Miranda* warnings until after the suspect had made incriminating admissions. The *Miranda* warnings came before any incriminating remarks.

 Williams's other assertions that the officers violated *Miranda* are likewise unavailing. As noted above, Williams initially denied having been with Quisenberry the night of the murder or having been at Harper's residence. Gradually, however, the LMPD officers persuaded him that they had compelling evidence that he and Quisenberry had been with Harper, and at that point, apparently fearful of what Quisenberry may have told the officers, Williams grew frustrated, and the following exchange took place:

Williams: This is, I'm tellin' you, it is a game. 'Cause see what happened, a m_ f_ got to y'all and told y'all his story. So, therefore, he got to y'all first.

Det. Arnold: No.

Williams: Man, I won't ...

Det. Arnold: I'll let you listen to his story if you want; I don't care. You can hear his whole story if that's what you

wanna do. You just gotta tell me yours. [pause] Man, you ain't a bad dude. You made some bad choices, but you ain't a bad dude. Jamo [Quisenberry] ain't a bad guy either. He done some stupid s____. And he's right in the middle of this just like you are.

Williams: Man, tell me sir. Y'all just need to go on and take me to jail.

Det. Arnold: I'll take you down to jail, that's fine. I just . . .

Williams: I don't give a f____, dog, f____ it.

Williams contends these last remarks were, in effect, an invocation of his right to remain silent, that they amounted to a demand that the questioning cease and that he be taken to jail. Even if that *might* be what Williams meant to say, however, those remarks were far from unambiguous. They could just as well have been a concession of his predicament, a "You've got me; you might as well take me to jail." At the suppression hearing, Detective Arnold testified that he understood Williams's remarks in this latter sense, not as a request to cease the exchange and be taken to jail, but as marking Williams's realization that his blanket denials were not working and his situation was serious. As a reasonable officer could certainly have interpreted Williams's "take me to jail" remarks in that way and not as an assertion of rights, *Miranda* and *Edwards* did not preclude further questioning.

A few minutes later, after Williams had admitted that he and Quisenberry had gone to Harper's house to obtain drugs and that the deal had gone bad and turned violent, Detective Arnold asked if Williams had ever seen the murder weapon, a 9 mm handgun, before. Williams said that he had. When asked who had possessed it, however, he became concerned about being thought a "snitch":

Det. Arnold: Where have you seen it [the gun] before?

Williams: Where you think I seen it before?

Det. Arnold: I don't know, man. Don't play with me. I just wanna know who had it; just say the name.

Williams: [inaudible] . . . snitched.

Det. Arnold: If you're worried about snitching and you're going to the death penalty, going to the freakin' death row, then, then be proud of yourself. But I mean, snitching . . .

Williams: Man, I'm freezing in here.

Det. Arnold: Snitching has nothing to do with nothing right now. There's 5000 snitches over in that jail.

Williams: I already know.

Det. Arnold: I know you do, but . . . I know you do. [pause]

Williams: This is all I'm saying, can I tell my lawyer the real story and he tell y'all?

Det. Arnold: Sure. He can hear the story.

Williams: Can he tell y'all?

Det. Arnold: You can do whatever you want to do. You have every right to do what you wanna do. That's why we went over the Rights Waiver Form when you first walked in here. But I would like for you to tell me, so I can go to the prosecutor and tell them right now, or tomorrow morning.

Williams: And I'm still convicted, regardless.

Det. Arnold: I don't know about you, whether you'll be convicted or not. I know right now that if I didn't have a case, I wouldn't be bringing you in here arresting you.

Williams: Right.

Det. Arnold: Then, after a year, I would arrest somebody and press charges. I have to end the case.

Williams: I understand what you're saying.

Det. Arnold: You know, I mean that's why. And there's physical evidence, there's forensic evidence, there's statements, and there's other people that have been interviewed, and so on and so forth. It's a situation where, you know, if you want to admit to the best of a bad situation, then get back to what you were talking about as far as him going in there to do whatever he was gonna do [inaudible] And tell me what that's all about.

Williams then made further incriminating statements.

Williams contends that his question about dealing with the police through counsel was a request to do so, and so should have brought his questioning to an end. Again, however, what Williams said was ambiguous. Was he asking for counsel or was he merely asking if counsel was an option? Was his interest in counsel for the sake of counsel's advice or merely in hopes that counsel could screen him from being perceived as a snitch? An officer in these circumstances would reasonably have entertained doubts about Williams's meaning, and thus it was not improper for the detective to continue the interrogation unless and until Williams made his desire for counsel clear, something he never did. Williams's counsel question was similar to the suspect's question in *Davis v. United States*,—"Maybe I should talk to a lawyer?"—that the Supreme Court held was not the unequivocal request for counsel required to activate the *Edwards* prohibition against further questioning. Neither was Williams's, "Can I tell my lawyer the real story and he tell y'all?"

With respect to Williams, in sum, the trial court did not err either by refusing to suppress Williams's August 29, 2007, statement to LMPD officers or by denying his motion for separate trials. Williams's ambiguous references to counsel during his questioning did not suffice to invoke his rights under *Miranda* and *Edwards,* and the introduction of both defendants' statements did not require separate trials where the statements were redacted in compliance with *Bruton, Richardson,* and *Gray.*

## Commonwealth v. Quisenberry—2009–SC–000302–MR

We turn now to the appeal of James Quisenberry. For his role in the crimes perpetrated against Harper and her daughter, the jury found Quisenberry guilty of first-degree robbery, second-degree manslaughter, facilitation of both attempted murder and first-degree assault, and tampering with physical evidence. Quisenberry's principal contention on appeal is that the evidence was insufficient to support any of his convictions. He also contends that cumulative punishment for the two facilitation offenses violates the state and federal constitutional proscriptions against double jeopardy.

### I. Sufficient Evidence Supported Quisenberry's Convictions.

In a criminal prosecution, of course, it is the Commonwealth's burden to prove each element of the alleged offense beyond a reasonable doubt. *In the Matter of Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). At the close of the Commonwealth's case and again at the close of Williams's evidence, Quisenberry moved for a directed verdict of acquittal on the ground that the evidence was insufficient. The trial court is to grant such a motion only if the evidence, when construed in favor of the Common-

wealth, could not induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty. "There must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Commonwealth v. Benham,* 816 S.W.2d 186, 187–88 (Ky.1991).

 When the denial of a properly preserved directed verdict motion is challenged on appeal, the standard of review is likewise whether, viewing the evidence in the light most favorable to the Commonwealth, any rational juror could have found all the elements of the crime. *Id.* As the Commonwealth points out, however, our rules provide that "[a] motion for a directed verdict shall state the specific grounds therefor." Kentucky Rule of Civil Procedure (CR) 50.01.[4] We have held that insufficiently specific motions for directed verdict do not preserve sufficiency of the evidence challenges for appeal and that in such cases the appropriate standard of review is not the "any rational juror" standard from *Benham* but the palpable error standard of RCr 10.26. *Johnson v. Commonwealth,* 292 S.W.3d 889 (Ky.2009); *Potts v. Commonwealth,* 172 S.W.3d 345 (Ky.2005).

Under that standard, appellate relief may not be granted unless a clear error at trial affected the appellant's substantial rights and resulted in manifest injustice. *Commonwealth v. Jones,* 283 S.W.3d 665 (Ky.2009); RCr 10.26. Whether in this context the two standards, "any rational juror" vs. "palpable error," differ is open to some debate. Discussing the similar

federal rules and noting that an unsupported conviction is apt to violate a defendant's substantial rights, the Ninth Circuit Court of Appeals has observed that it is difficult to "envision a case 'in which the result would be different because of the application of one rather than the other of the standards of review.'" *United States v. Alvarez–Valenzuela,* 231 F.3d 1198, 1201 (9th Cir.2000) (quoting from *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1010 (9th Cir.1995)). The Fifth and Sixth Circuits, on the other hand, have held that unpreserved sufficiency of the evidence challenges will result in reversal only "if the record is devoid of evidence pointing to guilt." *United States v. Damra,* 621 F.3d 474, 494 (6th Cir.2010) (citation and internal quotation marks omitted); *United States v. Robles–Pantoja,* 887 F.2d 1250 (5th Cir.1989). There do not appear to be any cases, however, in which relief was not available under one standard but would have been under the other. Similarly, in *Potts v. Commonwealth,* although we were at some pains to leave open the possibility that a failure of proof might not amount to manifest injustice, the evidence in that case, we held, was sufficient even under the "any rational juror" standard.

Similarly here. We agree with the Commonwealth that Quisenberry's directed verdict motions, which asserted only the "insufficiency of the evidence," did not comport with our rules' specificity requirement, and thus did not properly preserve the issue for appeal. Our review, therefore, is under the palpable error standard, but we need not decide how that review

---

**4.** The Kentucky Rules of Criminal Procedure do not expressly provide for directed verdicts, but by making directed verdict motions a prerequisite to a post-trial motion for a judgment of acquittal, RCr 10.24 confirms the presumption that directed verdicts may be entered in criminal cases. Under RCr 13.04, any gap in the Criminal Rules is filled by reference to the appropriate civil rule, here CR 50.01. *See Pate v. Commonwealth,* 134 S.W.3d 593 (Ky. 2004) and *Daniel v. Commonwealth,* 905 S.W.2d 76 (Ky.1995), applying CR 50.01 to criminal cases.

might differ from review under the *Benham* "any rational juror" standard, for even under the latter standard the evidence was sufficient.

Quisenberry concedes that for directed verdict purposes the Commonwealth adequately proved Harper's murder, the assault upon Erica, the commission of a robbery, and the tampering with physical evidence. The photos of Harper's body at the scene; the testimony of the officers who witnessed Erica there; the medical examiner's reports; the recovered bullets and casings; the ransacked safe, emptied purse, and strewn-about pill bottles; and the credit cards, driver's license, and other items found in the catch basin, was evidence more than sufficient to permit a finding that the alleged crimes occurred. What the Commonwealth failed to prove, however, according to Quisenberry, was his participation in those crimes. He concedes his presence, as his cell-phone records and DNA on the cigarette butt at the scene suggest and as his statement to the detectives confirms, but mere presence at the scene does not prove participation in the crimes. Otherwise, Quisenberry maintains, there was no evidence that he intended or aided the robbery, that he wantonly contributed to a substantial risk of Harper's death, that he knew Williams intended to assault or to kill Erica and contributed to Williams's doing or attempting to do so, or that he had anything to do with concealing either the murder weapon or the property stolen from Harper. The Commonwealth failed to prove, in other words, according to Quisenberry, that he bore a criminal state of mind or did anything to further the crimes. We disagree.

**A. There Was Sufficient Evidence of Quisenberry's Participation in the Robbery.**

Seldom is there direct evidence of a defendant's state of mind, but direct evidence is not required. As we recently reiterated in *Rogers v. Commonwealth,* 315 S.W.3d 303 (Ky.2010), state of mind—intent in that case—may be established by circumstantial evidence. That evidence includes the defendant's "actions preceding and following the charged offense," *Commonwealth v. Suttles,* 80 S.W.3d 424, 426 (Ky.2002), as well as the defendant's knowledge and the surrounding circumstances. *Marshall v. Commonwealth,* 60 S.W.3d 513 (Ky.2001). With respect to robbery, moreover, we also noted in *Rogers* that to be convicted of that crime, "the accused need not have taken any money or other property from the victim with his own hands, or actually participated in any other act of force or violence; it is sufficient that he came and went with the robbers, was present when the robbery was committed, and acquiesced." 315 S.W.3d at 312 (citing *Commonwealth v. Smith,* 5 S.W.3d 126 (Ky. 1999)). From those circumstances, a reasonable juror could infer that the accused intended the robbery to occur and lent aid, if only by virtue of his approbation and the extra intimidation his presence adds to the force employed by others. *See* KRS 502.020 (providing in part that one is guilty of an offense committed by another if, intending to promote the offense, he aids in its commission).

Here, of course, there was evidence that the two defendants had been together at a Walgreens pharmacy not long before the crimes, which permitted an inference that they drove to Harper's home together, and there was also Rashon Turner's testimony that Williams arrived at his mother's house in a car driven by Quisenberry, permitting an inference that the two left the robbery together as well. Turner also testified that Williams claimed Quisenberry went with him to Harper's house to obtain pills.

By his own testimony, of course, Quisenberry acknowledged being present at Harper's home when the robbery must have occurred. The phone records established two calls to Harper from Quisenberry's phone, shortly after midnight on May 18. Given the evidence that Harper's pills were stolen, a reasonable juror could also infer that the pair's trip to the Walgreens pharmacy was also somehow an attempt to obtain pills, and that their breaking into the Walgreens pharmacist's car could reasonably be thought related: retaliation perhaps, or, at the very least, evidence of the men's willingness that night to break the law in pursuit of their goals. Not only was there evidence that Quisenberry drove Williams to and from the scene, but when the police interviewed him not long after the crimes, he concealed what he knew. From these circumstances a reasonable juror could conclude that Quisenberry was not a mere bystander at the robbery, but that he initiated contact with Harper, that he shared with Williams the purpose of obtaining drugs by whatever means necessary, that he drove the pair to Harper's home, and, however the robbery may have commenced, acquiesced in it once it had, and assisted in the getaway. There was sufficient evidence, in other words, of Quisenberry's complicity in the robbery; the trial court did not err by so finding.

**B. There Was Sufficient Evidence Of Manslaughter.**

With respect to the charge of second-degree manslaughter, we note that if in the course of a robbery a participant other than the defendant commits an act of killing, the defendant may be judged complicit in the killing to the extent that his participation in the robbery establishes, with respect to the killing, a culpable state of mind, whether intent, aggravated wantonness, wantonness, or recklessness. *Meredith v. Commonwealth,* 164 S.W.3d 500 (Ky.2005). To justify an instruction on second-degree manslaughter, which applies to wanton killings, KRS 507.040, the Commonwealth was required to prove that Quisenberry acted wantonly, *i.e.,* that the robbery posed a substantial risk to Harper's life and that Quisenberry consciously disregarded that risk when he participated in the robbery.

Repeating his argument that the evidence failed to establish his participation in the robbery, Quisenberry maintains that he likewise could not be deemed complicit in Harper's killing. As discussed above, however, there was sufficient evidence that Quisenberry joined in the robbery. His ability to describe the murder weapon to the detectives, moreover, permits an inference that he knew Williams was armed, and we have held that knowing participation in an armed robbery, where there is obviously a substantial risk that someone will be killed, may be deemed wanton, at least. *Kruse v. Commonwealth,* 704 S.W.2d 192 (Ky.1985). The trial court did not err, therefore, by instructing the jury on second-degree manslaughter.

**C. By Requesting Facilitation Instructions, Quisenberry Waived Any Claim That The Evidence Was Insufficient As To Those Offenses.**

Quisenberry next contends that the evidence fails to support his convictions for facilitating the assault upon and the attempted murder of Erica. As the Commonwealth points out, however, at the close of proof, when the trial court and parties were discussing the jury instructions, Quisenberry himself requested facilitation instructions and referred the court to evidence he claimed supported them. These alleged errors, therefore, were not merely unpreserved, they were invited. Generally, a party is estopped from asserting an invited error on appeal. *Gray v. Commonwealth,* 203 S.W.3d 679 (Ky.2006).

Noting the United States Supreme Court's distinction, in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), between forfeited errors, which are subject to plain error review, and waived errors, which are not, the Ninth Circuit Court of Appeals has held that invited errors that amount to a waiver, *i.e.,* invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review. *United States v. Perez,* 116 F.3d 840 (9th Cir.1997). Applying that approach to a case very much like this one, in which the defendant requested a manslaughter instruction as a lesser offense, was convicted of manslaughter, and then appealed on the ground that the manslaughter evidence was insufficient, the Court of Appeals of Maryland held that the defendant's "specific request for a voluntary manslaughter instruction . . . constituted an intentional waiver of the right to argue on appeal that the evidence was insufficient to support the voluntary manslaughter conviction." *State v. Rich,* 415 Md. 567, 3 A.3d 1210, 1218 (2010). We agree.

Quisenberry's express representation to the trial court that the evidence of facilitation was sufficient, waived his right to claim on appeal that it was not. Quisenberry is not entitled to relief from his facilitation convictions, therefore. Moreover, he would not be even were we to consider his claim on the merits, for it was not unreasonable for the jury to entertain a reasonable doubt that Quisenberry intended or promoted the attack upon Erica but to believe that he knew at some point that the attack was about to occur or was occurring and yet remained and continued to assist Williams, at least by driving him away from the scene.

**D. There Was Sufficient Evidence That Quisenberry Tampered With Physical Evidence.**

Finally, Quisenberry contends that the evidence does not support his conviction for tampering with physical evidence. Under the pertinent section of KRS 524.100, a person is guilty of that offense when, believing that an official proceeding may be instituted he "destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with the intent to impair its verity or availability in the official proceeding." The jury was instructed that it could find Quisenberry guilty of tampering if "acting alone or in complicity with Kenneth Williams, [he] concealed or removed firearms or personal property of Earon Harper that he believed were about to be produced or used in a criminal prosecution or official proceeding." We have upheld this sort of combination principal/abettor instruction where there is evidence that two or more defendants acted in concert, but it is not clear whether both were principals or which was principal and which abettor. *Halvorsen v. Commonwealth,* 730 S.W.2d 921 (Ky.1986). Here, the evidence that Quisenberry participated in the robbery and that Harper's personal effects and those of the Walgreens pharmacist were found a short time after Harper's murder in a catch basin near her residence permitted a rational juror to conclude either that Quisenberry had aided Williams in disposing of those items or that he had disposed of them (or some of them) himself intending to conceal them and to prevent their use as evidence in the proceeding against him. The trial court did not err by deeming the tampering evidence sufficient.

**II. Quisenberry's Convictions For Facilitating Both Assault And Attempted Murder Did Not Subject Him To Double Jeopardy.**

Finally, Quisenberry contends that the charges of assault and attempted

murder of Erica are predicated on a single act and that his punishments for facilitating each of those offenses thus violate his right under the double jeopardy provisions of the United States and the Kentucky Constitutions not to be punished more than once for a single crime. Had Erica been shot only once, we might agree. But, under KRS 505.020 and double jeopardy precedent, the two gunshot wounds, one to the thigh and one to the head, support the two separate charges.

 As Quisenberry correctly notes, the Double Jeopardy Clauses of Section 13 of the Kentucky Constitution and the Fifth Amendment to the United States Constitution protect against multiple punishments for the same offense as well as against subsequent prosecution for the same offense after acquittal or conviction. *Commonwealth v. Burge,* 947 S.W.2d 805 (Ky.1996). Generally, the protections accorded by our state constitution "parallel those guaranteed by the Fifth Amendment." *Id.* at 809. The United States Supreme Court has explained that the double jeopardy protection against cumulative punishments "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, ... the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984) (internal citations omitted). Congress is presumed ordinarily not to intend to punish the same offense under two different statutes, and accordingly, "where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative

intent." *Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). Whether different statutory provisions proscribe the same offense may be determined by asking whether each provision "contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (citing *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

In Kentucky, the General Assembly has declared its intent regarding multiple punishments in KRS 505.020:

(1) When a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense. He may not, however, be convicted of more than one

(1) offense when:

(a) One offense is included in the other, as defined in subsection (2); or

(b) Inconsistent findings of fact are required to establish commission of the offenses; or

(c) The offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was uninterrupted by legal process, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

(2) A defendant may be convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c) It differs from the offense charged only in the respect that a lesser kind of culpability suffices to establish its commission; or

(d) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest suffices to establish its commission.

We have understood this statute to incorporate the *Blockburger* "same elements" test, *Clark v. Commonwealth,* 267 S.W.3d 668 (Ky.2008), but, as noted above, to the extent that the statute expands upon or otherwise clearly departs from *Blockburger,* the General Assembly's intent controls. Under KRS 505.020, a defendant may be prosecuted for both an offense and a lesser offense included therein, but he may be convicted of and punished for only one of them.

Quisenberry contends that under the facts of this case the assault on Erica is a lesser offense included within the attempted murder, the two offenses differing only in that the assault is established by a lesser kind of culpability—the intent to injure—as opposed to the intent to kill required for attempted murder. *See* KRS 505.020(2)(c) (lesser included offense when only difference is one offense involves "a lesser kind of culpability"). Lending some support to this contention is *Perry v. Commonwealth,* 839 S.W.2d 268 (Ky.1992) (citing *Luttrell v. Commonwealth,* 554 S.W.2d 75 (Ky.1977)), in which this Court held that under KRS 505.020, first-degree assault could, in certain circumstances, be deemed a lesser included offense of attempted murder. Noting the elements of the two offenses—for assault, intentionally causing serious physical injury by means of a deadly weapon or dangerous instrument and, for the attempted murder, taking a substantial step toward killing someone with the intent to kill—we explained that where the substantial step element of attempted murder was satisfied by the same weapon-inflicted injury constituting the assault, the only element separating the two offenses would be the defendant's mental state, with the intent to injure a lesser kind of culpability than the intent to kill. *Perry* involved two victims, one of whom, Hayden, was shot once and survived, while the other, a deputy sheriff, was shot several times and killed. As to Hayden, Perry shot him in the abdomen but then allegedly stood over as if to shoot again and, while pointing the gun at Hayden's head, said, "I'll let you live this time." 839 S.W.2d at 270–73. In those circumstances, the Court held the trial court did not err by instructing the jury on first-degree assault as a lesser included offense of attempted murder, leaving it to the jury to determine whether Perry intended to kill Hayden or just to injure him. *Perry,* 839 S.W.2d at 273. The jury in that case convicted Perry of only first-degree assault as to Hayden. Notably, other courts, faced with defendants convicted of both assault and attempted murder have held that where the two charges are based on a single gunshot, double jeopardy precludes punishment for both. *In the Matter of Orange,* 152 Wash.2d 795, 100 P.3d 291 (2005); *Commonwealth v. Anderson,* 538 Pa. 574, 650 A.2d 20 (1994).

Unlike the victims in *Perry, Orange,* and *Anderson,* however, who were shot once, Erica was shot not once, but twice. Our double jeopardy precedent recognizes this as an important distinction. In *Welborn v. Commonwealth,* 157 S.W.3d 608 (Ky.2005), this Court unanimously held that where the defendant shot the victim in the right arm, then the neck and, later, the shoulder, his convictions for three separate

charges of first-degree assault did not constitute double jeopardy. The Court reasoned that assault is a "result" offense requiring proof of three elements (the assailant's mental state, the means of attack and a resulting injury) and that because each shot of the gun entailed a culpable mental state, an attack on the victim and a separate injury, three assaults occurred under KRS 508.010. *Id.* at 612. In so holding, *Welborn* also relied on *Van Dyke v. Commonwealth,* 581 S.W.2d 563 (Ky. 1979), a case in which a defendant was convicted of two counts of rape and one count of sodomy based on acts against one victim, spanning approximately 15 minutes. Rejecting the concept that this was one continuing course of conduct, *Van Dyke* held that the fact that the criminal "acts occurred in a brief period of time with the same victim and in a continuum of force" did not protect the defendant from prosecution and conviction for each separate offense. 581 S.W.2d at 564. Indeed, "the legislature intended to punish each separate act of rape or sodomy." *Id.* Perhaps because of its reliance on *Van Dyke,* the Welborn Court also stated with respect to the assault case before it: "Each shot was preceded by a sufficient period of time in which Welborn could reflect on his conduct and formulate intent to commit another act." 157 S.W.3d at 612. This "time to pause and reflect" concept was cited by this Court rather recently in *Terry v. Commonwealth,* 253 S.W.3d 466, 474 (Ky. 2008), a case in which we upheld against a double jeopardy challenge the defendant's convictions for two counts of criminal mischief, one arising from damage to a mausoleum and another from damage to a casket contained therein.

Obviously the proof in this case allows for no conclusions about the time lapse between the two (or, as the medical examiner noted, perhaps three) gunshots inflicted on Erica. However, other double jeopardy precedent clarifies that each separate act violative of a criminal statute is a separate crime regardless of the time intervening between the acts. Thus, in *Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006), this Court unanimously upheld the defendant's conviction for intentional murder and seven counts of first-degree criminal abuse as to a twenty-month-old child. The child died of forcible asphyxiation but had numerous burns and bruises on her body. In addressing merger and double jeopardy as to the injuries, this Court noted that the trial court had dismissed one count of criminal abuse involving injuries to the child's mouth sustained in the asphyxiation because that course of conduct ultimately led to the child's death. However, the remaining seven abuse counts were properly based on discernibly separate acts of bruising and burning. After noting that the criminal abuse statute "clearly delineates the infliction of a single injury to be a unit of prosecution," the *Ratliff* Court held "[o]ne incident of applying a hot cigarette lighter to L.M.'s body created the prohibited result under KRS 508.100 ... and the subsequent act of reapplying the hot cigarette lighter to a different part of L.M.'s body constituted a second instance of conduct proscribed by KRS 508.100." 194 S.W.3d at 272–73. *Ratliff* made no reference to time to pause and reflect between criminal acts but focused, properly, on the relevant statutory language and what the evidence supported, i.e., how many separate violations of the statute occurred. *See also Williams v. Commonwealth,* 178 S.W.3d 491, 495 (Ky.2005) ("[A] person who generates differing and multiple prohibited photographs or causes a child to engage in the creation of such photographs commits multiple offenses (sic) of KRS 531.310, even though each such differing photograph involves the

same subject captured in a narrow time-frame.")

Given this precedent, it is apparent that Quisenberry's convictions for facilitating attempted murder and facilitating a first-degree assault are not punishment for the same criminal act, in violation of the proscriptions on double jeopardy. Erica's thigh and head injuries were markedly distinct, and it is perfectly reasonable to regard them as constituting separate offenses, the shot to the thigh an assault with the intent to injure and the shot to the head an attempt to kill. Because Quisenberry was thus not punished twice for having facilitated a single crime, he is not entitled to double jeopardy relief.

### CONCLUSION

In sum, the joint trial of Williams and Quisenberry was fair to both, notwithstanding the introduction of paraphrased versions of their redacted pretrial statements and their mutual denials of responsibility. In obtaining Williams's statement, the police officers did not violate Williams's rights under *Miranda*. The evidence of Quisenberry's participation in the crimes was sufficient to support his convictions. And, finally, Quisenberry's convictions for having facilitated both an assault upon and the attempted murder of Erica did not violate his double jeopardy rights. Accordingly, in both 2009–SC–000418–MR (Williams) and 2009–SC–000302–MR (Quisenberry), we affirm the judgments of the Jefferson Circuit Court.

All sitting. All concur.