RENDERED: OCTOBER 23, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0002-MR

GARY SWEET                                               APPELLANT

V.                  ON APPEAL FROM WAYNE CIRCUIT COURT
HONORABLE SARA B. GREGORY, JUDGE
NO. 19-CR-00158-001

COMMONWEALTH OF KENTUCKY                        APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Following a two-day trial, a Wayne County jury convicted Gary Sweet of first-degree rape, Class B incest, and being a first-degree persistent felony offender. He was sentenced to a total of thirty years in prison. Sweet now appeals as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Wayne Circuit Court.

## I. BACKGROUND

The following facts were uncontested at trial. Shortly after Sweet's marriage to Wilma[1] in April 2018, Sweet moved in with Wilma and her eighteen-year-old daughter, K.W.,[2] in Monticello, Kentucky. Sweet's marriage

---

[1] We omit Wilma's last name to further protect the identity of the victim.

[2] To protect the victim's privacy, she will be referred to by her initials.

to Wilma made K.W. Sweet's stepdaughter. K.W., who was intellectually disabled, functioned mentally, socially, and adaptively at the level of an eight-to-ten-year-old child. K.W. was prone to people-pleasing and manipulation.

Testimony at trial established that K.W. and Sweet had engaged in sexual intercourse approximately four times between April 2018 and May 8, 2019. The circumstances giving rise to this intercourse were disputed, particularly due to Wilma having recited two different version of events to police and yet another at trial. It is clear in all three versions told by Wilma that her relationship with Sweet was tumultuous. On May 8, 2019, Wilma's sister, Sarah, called the police following a domestic dispute between Wilma and Sweet which had prompted Wilma to disclose to Sarah allegations that Sweet had raped K.W. When police arrived, Wilma told an officer with the Monticello Police Department that Sweet had raped K.W. at least four times within the past three months. K.W. confirmed to police that this had happened. K.W. was taken to the hospital and evaluated, and Wilma obtained an emergency protective order for K.W. against Sweet.

Around this time, Sweet went to stay in Tennessee, where Wilma visited him. After a visit to Tennessee, Wilma took K.W. to the Monticello Police Department and asked to speak with an officer concerning her original statement to police that Sweet had raped K.W. Wilma told the officer that her prior statements to police were false in that Sweet did not rape K.W. but admitted that K.W. and Sweet had had sex. Wilma claimed that it was originally K.W.'s idea for them to have sex. Wilma insisted that K.W. had given

2

Sweet consent, Wilma had given them permission, and Sweet never forced K.W. to do anything she did not want to do. Wilma asserted that K.W. would come and tell Wilma that she wanted to "do stuff" with Sweet, but K.W. interjected and stated that she did not remember doing that. Wilma told police that K.W. was prone to lying and that Sweet had killed one of K.W.'s pet roosters for lying, but that K.W. is doing better now about telling the truth. Wilma indicated that K.W. loved her pets more than anything including herself, and K.W. was scared that Sweet would kill another of her animals. Wilma claimed that K.W. admitted to her later that she only did it because she did not want Sweet to leave Wilma, but K.W. interrupted and said she never wanted it to happen.

In this same interview, K.W. told police that Sweet had had sex with her and she never wanted it to happen. She recalled four times that she and Sweet had sex. She denied that he hurt her or held her down. She told Sweet "no" many times, but she was too scared and terrified to defend herself or attempt to escape when this occurred. She recalled that she was fearful that he would kill her animals if she did not let it happen. She told police that her mother knew and let the sex happen.

At Sweet's trial,[3] Wilma claimed that Sweet was the one to suggest that he have sex with K.W. and offered to be her boyfriend while remaining married to Wilma. Wilma testified that she first became aware that Sweet and K.W. had

_____

[3] At the time of trial, Wilma had already pled guilty to charges arising from her involvement in the case and was serving a fifteen-year sentence.

3

sex after she came home from work one day in November 2018 and K.W. told her what had happened. This caused strife between Wilma and Sweet, with Wilma continually telling Sweet that he could not do this, and Sweet insisting that it was not a big deal. However, when Wilma and K.W. would object, Sweet's behavior towards them would worsen, eventually leading up to him killing K.W.'s rooster in front of K.W. Wilma testified that she observed Sweet attempting to coach and convince K.W. to proceed with the relations. Wilma testified that she also observed K.W. telling him that she did not want to engage in sex with him, but he would promise to buy her things like a rabbit or other animals.

After the initial encounter in November 2018, Wilma described three more times that she was aware that K.W. and Sweet had sex. The next time was at the end of December 2018 or the beginning of January 2019. Wilma was home and heard the two in K.W.'s bedroom, so she entered the room and witnessed them having sex. She testified that the third time was around the beginning of 2019, and the fourth time was around the end of April 2019.

The couple continued to fight, mainly over K.W., which led to the aforementioned domestic dispute on May 8, 2019. As a result of the domestic dispute, Sweet returned to Tennessee and Sarah reported the alleged rape to the police. Wilma testified that when she went to visit Sweet in Tennessee, Sweet threatened to have K.W. and Sarah killed if she did not recant her allegations to the police. Wilma explained that this was why she thereafter told police that the rape allegations were false.

4

At trial, Sarah testified that when Wilma returned from Tennessee around May 16, 2019, Wilma yelled at K.W. and told her that K.W. needed to go change her story because Sweet had made threats against K.W.'s and Sarah's lives. Sarah also testified that while K.W. had a history of lying, she has become more truthful as she has gotten older.

K.W. testified that she told Sweet many times that she did not want to have sex with him, but he would not take no for an answer. She testified that the very first time they had sex, she told him "no" numerous times but "he just did it." She testified that she never wanted to do it, never told her mom that she wanted to do it, and never told Sweet that she wanted to do it. She testified that he had sex with her four or five times, and her mother knew it was going on. She testified that she never told anyone what was going on because she was scared of him, and he had threatened her that if word got back to anyone about what he was doing, he would hurt her mother and her pets. She testified that she knew he would do it because he once broke her rooster's neck in front of her when she told him that she did not want to have sex with him.

The jury ultimately convicted Sweet of first-degree rape, Class B incest, and being a first-degree persistent felony offender. He was sentenced to a total of thirty years in prison.

## II. ANALYSIS

**A. Although it was error for the jury instructions to include elements that did not constitute the crimes charged, this error did not rise to the level of palpable error.**

Sweet's first two arguments are intertwined and will be discussed concurrently. Sweet argues that a manifest injustice occurred when the trial court used jury instructions for first-degree rape and Class B incest that did not include elements of those crimes, and that this resulted in non-unanimous verdicts. These issues were not preserved for appeal, but Sweet requests palpable error review under Kentucky Rules of Criminal Procedure ("RCr") 10.26. Applying palpable error review to issues potentially invoking a juror unanimity issue requires first determining whether there has been an error in the jury instructions, then determining whether the error was palpable. *Johnson v. Commonwealth*, 676 S.W.3d 405, 410 (Ky. 2023).

In this case, the Grand Jury Indictment charged:

Count I
That between April 6, 2018 and April 30, 2019, in Wayne County, Kentucky, Gary Sweet committed the offense of Rape, 1st Degree, a Class B Felony, in violation of K.R.S. 510.040 as a continuing course of conduct against a vulnerable victim, by engaging in sexual intercourse with K.W., who is incapable of consent and/or by forcible compulsion, against the peace and dignity of the Commonwealth of Kentucky.

Count II
That between April 6, 2018 and April 30, 2019, in Wayne County, Kentucky, Gary Sweet committed the offense of Incest, a Class B Felony, in violation of K.R.S. 530.020 as a continuing course of conduct against a vulnerable victim, by engaging in sexual intercourse with K.W., who is incapable of consent and/or by forcible compulsion, against the peace and dignity of the Commonwealth of Kentucky.

6

At trial, for first-degree rape, the jury was instructed:

CHARGE NO. 1
RAPE, 1ST DEGREE

You will find the Defendant guilty of Rape, 1st Degree under the Instruction if you believe from the evidence beyond a reasonable doubt all of the following:

A. That in Wayne County, Kentucky on or between April 6, 2018, and April 30, 2019, and before the finding of the indictment herein, the Defendant engaged in sexual intercourse with K.W.

AND EITHER:

B. He did so by forcible compulsion.

OR

C. That K.W. was a vulnerable victim, AND the Defendant knowingly had sexual intercourse with a vulnerable victim; AND the sexual intercourse with K.W. occurred two or more times between April 6, 2018, and April 30, 2019.

The Commonwealth told the jurors that they all need not agree as to whether element B or C was satisfied so long as every juror believed at least one of them was satisfied.

Combination jury instructions do not "deprive a defendant of his right to a unanimous verdict, so long as there is evidence to support a conviction under either theory." *Johnson*, 676 S.W.3d at 411. However, palpable error occurs when jury instructions allow "the jury to find the defendants guilty under instructions which, on their face, did not constitute the crimes charged." *Stewart v. Commonwealth*, 306 S.W.3d 502, 509–10 (Ky. 2010). Jury instructions must properly and intelligibly state the law and inform the jury of what must be believed from the evidence in order to return a verdict in favor of the party who bears the burden of proof. *Wright v. Commonwealth*, 391 S.W.3d 743, 746 (Ky. 2012). "In criminal cases, instructions 'should conform to the

7

language of the statute.'" *Id.* (quoting *Parks v. Commonwealth,* 192 S.W.3d 318, 326 (Ky. 2006)).

Kentucky Revised Statutes ("KRS") 510.040 defines the elements of rape in the first degree:

> (1) A person is guilty of rape in the first degree when:
> (a) He engages in sexual intercourse with another person by forcible compulsion; or
> (b) He engages in sexual intercourse with another person who is incapable of consent because he:
> 1. Is physically helpless; or
> 2. Is less than twelve (12) years old.

While intercourse with a victim incapable of consent due to an intellectual disability is not an element of rape in the first degree, it is an element of rape in the second degree. KRS 510.050 states:

> (1) A person is guilty of rape in the second degree when:
> (a) Being eighteen (18) years old or more, he or she engages in sexual intercourse with another person less than fourteen (14) years old; or
> (b) He or she engages in sexual intercourse with another person who is mentally incapacitated or who is incapable of consent because he or she is an individual with an intellectual disability.

KRS 501.100 defines an offense against a vulnerable victim to include violations of KRS 510.040 and 510.050 if the victim is an individual with an intellectual disability, physically helpless, or mentally incapacitated as defined in KRS 510.010. These terms are defined in KRS 510.010 as:

> (4) "Individual with an intellectual disability" means a person with significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period, as defined in KRS Chapter 202B;
> (5) "Mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling his or her conduct as a result of the influence of an intoxicating substance

8

administered to him or her without his or her consent or as a result of any other act committed upon him or her without his or her consent;

. . . .

(6) "Physically helpless" means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act. "Physically helpless" also includes a person who has been rendered unconscious or for any other reason is physically unable to communicate an unwillingness to an act as a result of the influence of a controlled substance or legend drug;

Here, the instructions allowed the jury to convict Sweet if they found that he either had sexual intercourse with K.W. by forcible compulsion or, in the alternative, if the jury found that K.W. was a vulnerable victim, Sweet knew she was a vulnerable victim, and the intercourse happened two or more times in a specified period. KRS 501.100 provides an avenue to convict a person of an offense against a vulnerable victim in a continuing course of conduct if the jury unanimously agrees that two or more acts in violation of the same statute occurred during the specified period of time, but the jury does not need to agree on which specific acts occurred. However, KRS 501.100 is not a substitute for meeting the statutory definitions of the underlying offense. To convict under KRS 510.040 against a vulnerable victim in a continuing course of conduct, the jury still must find that all elements of KRS 510.040 have been met. KRS 501.100 is not a substitute for elements of KRS 510.040. Rather, it is an avenue for the jury to disagree on which of the particular instances of rape occurred but yet still convict if all jurors believe that the act occurred two or more times. The jury still must find that all elements of KRS 510.040 were met in order to convict the defendant of rape in the first degree.

9

In *Travis v. Commonwealth*, 327 S.W.3d 456, 463 (Ky. 2010), this Court held that flawed jury instructions containing both a legally erroneous theory and a legally sound theory implicate unanimity if it is reasonably likely that some members of the jury followed the erroneously inserted theory in reaching their verdict. "If that can be shown, then a unanimous verdict has been denied and the verdict must be overruled." *Id.* We have clearly stated that allowing the jury to consider a legally permissible theory of a crime along with a legally impermissible one violates the requirement of a unanimous verdict when it is impossible to know under which theory the jurors convicted. *Commonwealth v. Goss*, 428 S.W.3d 619, 625 (Ky. 2014). Such lack of unanimity violates Section 7 of the Kentucky Constitution. *McNeil v. Commonwealth*, 468 S.W.3d 858, 865 (Ky. 2015). Here, it is impossible to tell whether the jurors convicted Sweet under the forcible compulsion theory or the vulnerable victim theory. As a result, it is impossible to tell whether all jurors unanimously convicted Sweet of rape in the first degree under a lawful basis (forcible compulsion) or an unlawful basis (vulnerable victim). Because of this result, Sweet was deprived of his right to a unanimous verdict.

Sweet contends that a similar error occurred regarding the incest instructions. For Class B incest, the jury was instructed:

CHARGE NO. 2
INCEST
You will find the Defendant guilty of Incest under the Instruction if you believe from the evidence beyond a reasonable doubt all of the following:

A. That in Wayne County, Kentucky on or between April 6, 2018, and April 30, 2019, and before the finding of the indictment herein, the Defendant engaged in sexual intercourse with K.W.
AND
B. That K.W. was his stepdaughter
AND
C. That he knew K.W. was his stepdaughter.
AND AT LEAST ONE OF THE FOLLOWING:
D. He did so by forcible compulsion.
OR
F. At the time of the sexual intercourse, K.W. was incapable of consent because she was physically helpless or mentally incapacitated.
OR
G. That K.W. was a vulnerable victim, AND the Defendant knowingly had sexual intercourse with a vulnerable victim; AND the sexual intercourse with K.W. occurred two or more times between April 6, 2018, and April 30, 2019.

As with violations of KRS 510.040 and KRS 510.050, violations of KRS 530.020 are considered an offense against a vulnerable victim if the victim is an individual with an intellectual disability, physically helpless, or mentally incapacitated, as those terms are defined in KRS 510.010. At the time these offenses occurred, KRS 530.020 defined the elements for incest as:

(1) A person is guilty of incest when he or she has sexual intercourse or deviate sexual intercourse, as defined by KRS 510.010, with a person whom he or she knows to be an ancestor, descendant, uncle, aunt, brother, or sister. The relationships referred to herein include blood relationships of either the whole or half blood without regard to legitimacy, relationship of parent and child by adoption, relationship of stepparent and stepchild, and relationship of stepgrandparent and stepgrandchild.
(2)      (a) Incest is a Class C felony if the act is committed by consenting adults.
(b) Incest is a Class B felony if committed:
        1. By forcible compulsion as defined in KRS 510.010(2); or
        2. On a victim who is:
            a. Less than eighteen (18) years of age; or
            b. Incapable of consent because he or she is physically helpless or mentally incapacitated.

11

(c) Incest is a Class A felony if:
      1. Committed on a victim less than twelve (12) years of age; or
      2. The victim receives serious physical injury.

Sweet asserts that, unlike the rape statute, the incest statute does not criminalize having intercourse with a relative who is incapable of consent due to an intellectual disability. Sweet contends that the only way for him to be found guilty of Class B incest under the facts of this case is if the jury believed there was forcible compulsion. Yet, the jury instructions allowed for the jury to find him guilty under either forcible compulsion or a vulnerable victim avenue. Again, the legally vulnerable victim statute does not replace the need to satisfy the statutory elements of an offense. This mix of legally erroneous theory (here, the vulnerable victim requirement) and legally sound theory (here, forcible compulsion) implicates the constitutional concerns of a unanimous jury discussed above.

Having determined that the jury instructions were erroneous, we turn our attention now to determine whether this error was invited — and thus waived — by Sweet's tendered jury instructions that contained the same errors with which he now finds issue. "Generally, a party is estopped from asserting an invited error on appeal." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37 (Ky. 2011) (citing *Gray v. Commonwealth*, 203 S.W.3d 679 (Ky. 2006)). "Invited errors amount to a waiver and are not subject to appellate review." *Webster v. Commonwealth*, 438 S.W.3d 321, 324 (Ky. 2014) (citing *Thornton v. Commonwealth*, 421 S.W.3d 372, 376–77 (Ky. 2013)). A party is deemed to

have invited an error, and to have therefore waived any assignment of error, when that party's actions amount to a "knowing relinquishment of a right." *Quisenberry*, 336 S.W.3d at 38 (citing *United States v. Perez*, 116 F.3d 840 (9th Cir. 1997)).

In *United States v. Perez*, the Ninth Circuit created a distinction between those rights which have knowingly been relinquished and thus waived, and those rights which have been forfeited because the defendant was unaware that the right was being violated. 116 F.3d at 845–46. In *Perez*, despite having submitted jury instructions containing the same error with which the defendants later found fault, the Ninth Circuit found that the defendants did not knowingly waive their rights because they had not acknowledged that the right existed but nevertheless abandoned it. *Id.* at 845. Instead, the *Perez* Court focused on the lack of any affirmative action taken on the part of the defendants which would have proven their knowledge of the right they would later assert on appeal. *Id.* 845–46. Because the defendants did not know they were circumventing their rights by their proposed jury instructions, the right was treated as forfeited rather than waived and was reviewed under Federal Rule of Criminal Procedure 52(b) for plain error. *Id.*

Kentucky has incorporated this same distinction between known and thus waived errors and unknown and thus forfeited errors into its own caselaw.[4] Consequently, errors not knowingly abandoned are not deemed

---

[4] *See Quisenberry*, 336 S.W.3d at 38 (citing *Perez*, 116 F.3d 840) ("Noting the United States Supreme Court's distinction . . . between forfeited errors, which are subject to plain error review, and waived errors, which are not, the Ninth Circuit Court

waived and, if otherwise eligible, remain subject to palpable error review. In Sweet's case, while there was discussion concerning the jury instructions prior to jury deliberations, these conversations did not address the error before us today. There is no evidence that Sweet knowingly abandoned his right to have the jury only consider elements of the crimes in which he was charged in determining guilt. Indeed, both Sweet and the Commonwealth submitted proposed jury instructions containing the errors, and the trial court finalized those erroneous instructions. It appears that none of the parties were aware that the jury instructions ran afoul of the statutory elements of first-degree rape and Class B incest. As a result, the issue here was not waived and Sweet is entitled to palpable error review.

In reaching this holding, we do not mean to imply that a defendant may have jury instructions reviewed for palpable error merely by claiming that he did not know that the instructions were incorrect. Instead, where the

of Appeals has held that invited errors that amount to a waiver, *i.e.*, invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review."); *Mullins v. Commonwealth*, 350 S.W.3d 434, 439 (Ky. 2011) (alterations in original) ("In Appellant's case, his trial counsel not only failed to object to the given instruction, but, in fact, made several emphatic representations to the trial court that his client did not want any lesser-included offense instructions and, more importantly, that there was no evidence in the record to support an EED instruction. As stated in *Quisenberry*, 'these alleged errors, therefore, were not merely unpreserved, they were invited.' *Id.* at 37. The Court noted that other courts have distinguished 'forfeited errors, which are subject to plain [or palpable] error review, and waived errors, which are not ... [and] ha[ve] held that invited errors that amount to a waiver, *i.e.*, invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review.' *Id.* at 38. (citing *United States v. Perez*, 116 F.3d 840 (9th Cir. 1997)). Therefore, '[g]enerally, a party is estopped from asserting an invited error on appeal.' *Id.* at 37 (citing *Gray v. Commonwealth*, 203 S.W.3d 679 (Ky. 2006)). Because Appellant specifically asked that no lesser included instruction be given and asserted multiple times that the evidence did not support an EED instruction, he 'waived his right to claim on appeal' that he was entitled to the instruction. *Id.*")

14

instructions plainly misstate the correct elements of a specific charge, we focus on the evidence in the record that suggests that the defendant was aware of, *i.e.*, knew of, the relinquished or abandoned right, and yet still accepted or proposed a flawed instruction for strategic purposes. Here, the record reveals no such strategic decision by Sweet.

We also emphasize the distinction between the facts at hand and our Kentucky precedent thus far addressing waiver of jury instructions. Up until this point, our Court has not found waiver of jury instructions in any case where the party has tendered a proposed set of jury instructions containing the same error later complained of on appeal. However, the holding of this case, which is strictly based on the factual nuances present, is not a departure from any prior precedent but, in fact, emphasizes key concerns present when our precedent on this topic was being developed. The modern version of waiver of jury instructions in Kentucky is discussed in *Quisenberry*, 336 S.W.3d 19. In *Quisenberry,* the defendant claimed it was error to give jury instructions for facilitation charges which the defendant claimed there was insufficient evidence to support. *Id.* at 37. Notably, the defendant had actually requested the same instructions at the close of proof. *Id.* This Court, acknowledging the distinction between **waived** and **forfeited** errors in *Perez,* 116 F.3d 840, stated that "Quisenberry's express representation to the trial court that the evidence of facilitation was sufficient, waived his right to claim on appeal that it was not." The Court further stated that the defendant would not be entitled to relief

15

from his conviction had the Court considered his claim on the merits, as there was sufficient evidence to present the claims to the jury.

The facts at hand are distinct from *Quisenberry* because in *Quisenberry*, the alleged error was the giving of a legally correct and otherwise non-contested jury instruction. This situation fits squarely within RCr 9.54, which addresses when a party "may assign as error the giving or the failure to give an instruction." Sweet's jury instructions fall outside of RCr 9.54 because the assigned error was not the giving or failing to give an instruction but rather the error was that the jury instructions themselves were faulty. Further, RCr 9.54 puts the onus on the court to "instruct the jury in writing on the law of the case . . . . These requirements may not be waived except by *agreement* of both the defense and the prosecution." (emphasis added). Where, as here, the defense counsel operated under a complete misunderstanding of the elements sufficient to convict the defendant of the crimes charged, the defendant cannot knowingly agree to relinquish his right to jury instructions which encompass the correct statutory elements of the crime. It is the responsibility of the trial judge to uphold the integrity of the criminal justice system by ensuring the jury is instructed on the correct elements of a crime, even when counsel are mistaken about those elements. Functioning as the gatekeeper of jury instructions is one of the few vital responsibilities the trial judge has during a trial. Allowing "waiver" of this responsibility by a mere unknowing mistake would effectively shift this responsibility away from the judge.

As the case law on waiver has developed in the Commonwealth, this Court has largely been presented with factual scenarios in which waiver is apparent, with the result being language which has gained momentum and more affirmatively sided with finding waiver as time has passed and no differentiating cases have called for qualifying language. The nuances which begat the waiver discussion in precedent on which *Quisenberry* is based have easily been swallowed by an indiscriminate rule of overly broad application: if the defendant proposes jury instructions containing the error, that error is deemed waived and unreviewable for palpable error. But the origin of *Quisenberry* reminds us that it cannot be so simple. *Quisenberry* states,

> Noting the United States Supreme Court's distinction, in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), between forfeited errors, which are subject to plain error review, and waived errors, which are not, the Ninth Circuit Court of Appeals has held that invited errors that amount to a waiver, i.e., invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review. *United States v. Perez,* 116 F.3d 840 (9th Cir. 1997).

*Perez* clearly distinguished the standard from finding waiver in every instance in which a defendant submits substantially similar jury instructions containing the same error later raised on appeal and, instead, emphasized that only those waivers which are knowing and intentional could amount to waiver:

> Here, however, the record reveals that neither defendants, the government, nor the court was aware of *Mendoza*'s requirement that the "in relation to" element be submitted to the jury. 11 F.3d at 128. Although Cruz and Perez did submit erroneous instructions, there is no evidence that they affirmatively acted to relinquish a known right. That is, there is no evidence that Cruz and Perez considered submitting the "in relation to" element to the jury, but then, for some tactical or other reason, rejected the idea. Thus, it cannot be said

17

that Cruz and Perez waived their right to have this element submitted to the jury; waiver occurs only when a defendant relinquishes or abandons a "known right."

*Perez*, 116 F.3d at 845–46. *Perez*, on which *Quisenberry* lays its foundation, would have clearly found that Sweet had not waived his right to have the jury decide his guilt in consideration of the proper elements of the charged crimes. We likewise decline to do so here.

We turn our attention now to whether the erroneous jury instructions rose to the level of palpable error under RCr 10.26. This rule allows for review of unpreserved errors by an appellate court where a palpable error affects substantial rights of a party. In such cases, appropriate relief may be granted only upon a determination that manifest injustice has resulted from the error. *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009). An error is "palpable" only if it is clear or plain under current law. *Id.* In general, a palpable error affects the substantial rights of a party only if "it is more likely than ordinary error to have affected the judgment." *Id.* (quoting *Ernst v. Commonwealth*, 160 S.W.3d 744, 762 (Ky. 2005)). A finding of palpable error requires a "substantial possibility" that a different result would have occurred but for the unpreserved error. *Johnson*, 676 S.W.3d at 417.

> In all cases presenting an unpreserved error regarding a unanimous jury, the courts must "plumb the depths of the proceeding" and scrutinize the factual idiosyncrasies of the individual case. That includes a consideration of the weight of the evidence. Only if, upon review, a court can conclude "the error is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process," will reversal be warranted. "It should be so egregious that it jumps off the page … and cries out for relief."

18

*Id.* (ellipses in original) (internal citations omitted).

Here, the jury instructions permitted jurors to find Sweet guilty of first-degree rape or Class B incest by finding that K.W. was a vulnerable victim, a statutorily impermissible basis for either charge, or by finding that Sweet had sexual intercourse with K.W. by forcible compulsion, a statutorily sound basis. Whether this error in the jury instructions constitutes palpable error necessarily includes "a consideration of the weight of the evidence." *Id.* The Commonwealth presented ample evidence to support the conclusion that any intercourse that occurred between Sweet and K.W. took place by forcible compulsion. Forcible compulsion is defined in KRS 510.010(2):

> "Forcible compulsion" means physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition[.]

A reasonable jury could find that evidence of forcible compulsion was satisfied through K.W.'s and Wilma's testimony regarding threats of harm Sweet made against family members coupled with the act of violence against K.W.'s pet. Furthermore, in her interview with police, K.W. claimed that she never wanted to have sex with Sweet and that she only did so because she was afraid of him.

After weighing this evidence, we conclude that the instructional error here was not "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Johnson*, 676 S.W.3d at 418 (citing *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006)). While the jurors were not required to agree on whether they believed a theory of forcible compulsion or

19

whether they believed a vulnerable victim theory, there was clearly ample evidence in the record for them to convict on the forcible compulsion theory. K.W.'s and Wilma's testimony regarding Sweet's threats, and K.W.'s statements to police that she feared Sweet, constituted straightforward evidence that intercourse occurred between Sweet and K.W. by "threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person . . . or fear of any offense under this chapter." KRS 510.010(2). This evidence was neither complex nor confusing, and as a result, we cannot say that but for the instructional error, there was a substantial possibility of a different result. There was no palpable error.

**B. The trial court did not err when it failed to strike Juror 629.**

Sweet contends that the trial court erred by failing to strike Juror 629 for cause during voir dire. Defense counsel used a peremptory challenge to strike Juror 629 instead of otherwise using that challenge to strike another juror who ended up deliberating in this case.

During voir dire, defense counsel questioned the potential jurors about the effect that Sweet's decision not to testify during trial would have on their ability to objectively weigh the evidence:

> **Defense Counsel**: Okay. Anybody else feel this way? It's an honest, a lot of people feel that way. I'm being honest with you. Sometimes I feel that way too. Okay. Anybody else feel that way?
>
> **Juror 629**: It would be hard to say he's not guilty if he doesn't testify. If he shows strong evidence that he's not guilty but hasn't testified. You can judge him wrong if he doesn't testify.
>
> **Defense Counsel**: Okay. Alright. And you feel that if he puts on a case, you know what the evidence is. You don't think he's strong,

20

he could be weak. You may have eleven circus clowns coming to testify about silly stuff, and nothing gets presented that is worth anything. That's true. I'm sure Matt's not going to do that, okay. But if he puts on anything, okay, anybody saying, "he did this to me? He touched me one time in a bad place," that's enough for you? So, he better get up there and say, "I didn't do that," before you can say he must not be guilty? He's got to tell you, "I didn't do that"? That person said, "I didn't do it." You want him to do that, correct?

**Juror 629**: Well no. [Inaudible] evidence they will have against him.

**Defense Counsel**: But as [the Commonwealth] told you, this is a "he says, she says" kind of case, okay. There's no forensic evidence, there's no video, there's no confessions. I said I didn't do that, okay. So if he doesn't say in response, "I didn't do that," and get on the witness stand right here and tell you that, are you going to hold it against him?

[Juror 629 shakes head indicating "no."]

**Defense Counsel**: No?

[Juror 629 shakes head indicating "no."]

**Defense Counsel**: You sure?

[Juror 629 nods head indicating "yes."]

**Defense Counsel**: I think you're holding out on me. Are you sure of that?

[Juror 629 raises hand in affirmation.]

At this point, defense counsel asked to approach the bench and requested Juror 629 be stricken for cause. Defense counsel claimed that Juror 629 stated that he would hold it against Mr. Sweet if he did not testify. The Commonwealth and the trial court responded that they heard Juror 629 say that he would not hold it against the defendant and assume he was guilty if he chose not to testify but he instead expressed concern about judging the defendant wrongly without hearing from him. The trial court offered to call

21

Juror 629 to the bench to clarify, but defense counsel declined and requested his objection be noted for the record. Sweet now contends that the trial court erred in failing to strike Juror 629 for cause.

A criminal defendant's right to an impartial jury is safeguarded by both Section 11 of the Kentucky Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. Regarding a trial court's decision to not strike a juror for cause, this Court reviews for an abuse of discretion. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007). Abuse of discretion occurs when a trial court acts in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). If a trial court abuses its discretion by failing to strike a juror for cause, a defendant's right to an impartial jury is violated, prejudice is presumed, and a structural error occurs mandating reversal. *Ward v. Commonwealth*, 587 S.W.3d 312, 327–28 (Ky. 2019).

"When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." RCr 9.36(1). This Rule is the only standard to be applied for addressing for-cause challenges to prospective jurors. *Sturgeon v. Commonwealth*, 521 S.W.3d 189, 194–95 (Ky. 2017). "Ultimately, '[i]t is the totality of all the circumstances . . . and the prospective juror's responses that must inform the trial court's ruling.'" *Ward*, 587 S.W.3d at 328 (quoting *Little v. Commonwealth*, 422 S.W.3d 238, 242 (Ky. 2013)).

22

Sweet points to case law in which potential jurors disclaim bias but yet their past experiences, outside knowledge of the case, or connections to parties or victims infer a strong probability of at least subconscious prejudice. *See Marsch v. Commonwealth*, 743 S.W.2d 830, 831–33 (Ky. 1988) (several prospective jurors were in possession of information or occupied such a relationship to the victim or his family as to create a reasonable inference of prejudice); *Fugate v. Commonwealth*, 993 S.W.2d 931, 938–39 (Ky. 1999) (potential jurors had ongoing professional relationships with the prosecutor, another potential juror admitted that his prior associations with a witness would "probably" cause him to give that witness a "head start"); *Pennington v. Commonwealth*, 316 S.W.2d 221, 223–25 (Ky. 1958) (juror who concealed his familial relationship to prosecuting witness was cause for a new trial); *Montgomery v. Commonwealth*, 819 S.W.2d 713, 716–18 (Ky. 1991) (exposure to adverse pretrial publicity caused potential jurors to form opinions as to defendant's guilt). In some of these cases, the potential juror's body language and strong emotional reactions cast the juror's promise to be unbiased in doubt. In cases where the potential juror has such connections or life experiences closely related to the subject matter of trial as to make a reasonable person doubt that juror's ability to remain unprejudiced, fears of unfairness should be resolved in favor of the criminal defendant. *Marsch*, 743 S.W.2d at 834.

Here, however, Juror 629 had no prior life experiences or connections to parties, victims, or witnesses as to make him presumptively biased. Sweet

23

contends that Juror 629 demonstrated bias based solely on the conversation between the juror and defense counsel. Sweet asserts that refusing to excuse a juror who would be prejudiced against a defendant because they did not testify on their own behalf is reversible error. *See Hayes v. Commonwealth,* 175 S.W.3d 574, 584 (Ky. 2005). While Sweet is correct in this assertion, the point of contention here is the intent behind Juror 629's words. The trial court interpreted Juror 629's statements to mean that he was concerned that the weight of the evidence would fall against the defendant if he does not testify, but he insisted that he would not hold it against the defendant if he did not testify. While the transcript does indicate ambiguity in Juror 629's intended meaning, trial courts are given discretion precisely because they are in the best position to interpret demeanor and body language. *Brown v. Commonwealth,* 313 S.W.3d 577, 599 (Ky. 2010); *Allen v. Commonwealth,* 278 S.W.3d 649, 652 (Ky. App. 2009). A transcript of words is completely devoid of subtle cues which give meaning to the words being spoken. Here, a review of the record reveals body language such as head nods, head shakes, and hand gestures which further support the trial court's interpretation of Juror 629's meaning. The trial court's interpretation of these gestures is deserving of deference. To the extent that any ambiguity remained as to what Juror 629 meant, the trial court offered, and defense counsel declined, to invite Juror 629 to the bench to resolve the ambiguity.

Sweet argues that inviting Juror 629 to approach the bench to resolve the ambiguity would have been an attempt to "rehabilitate" the juror, which is

24

an invalid basis for the Court to deny for cause strikes under *Montgomery*, 819 S.W.2d at 718. However, when put into context, *Montgomery* is referring to situations where bias is clear:

> One of the myths arising from the folklore surrounding jury selection is that a juror who has made answers which would otherwise disqualify him by reason of bias or prejudice may be rehabilitated by being asked whether he can put aside his personal knowledge, his views, or those sentiments and opinions he has already, and decide the case instead based solely on the evidence presented in court and the court's instructions. This has come to be referred to in the vernacular as the "magic question." But, as Chief Justice Hughes observed in *United States v. Wood*, 299 U.S. 123, 146 (1936), "[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of circumstances. It is not limited to the juror's response to a "magic question." In this case the record is replete with circumstances establishing an inference of bias or prejudice on the part of jurors so pervasive that the jurors were beyond being rehabilitated as appropriate jurors by affirmative answer to such a question, however well intentioned.

> There is no "magic" in the "magic question." It is just another question where the answer may have some bearing on deciding whether a particular juror is disqualified by bias or prejudice, from whatever source, including pretrial publicity. The message from this decision to the trial court is the "magic question" does not provide a device to "rehabilitate" a juror who should be considered disqualified by his personal knowledge or his past experience, or his attitude as expressed on voir dire. We declare the concept of "rehabilitation" is a misnomer in the context of choosing qualified jurors and direct trial judges to remove it from their thinking and strike it from their lexicon.

> It makes no difference that the jurors claimed they could give the defendants a fair trial. As we held in *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221, 224 (1958), "[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause;" and in *Tayloe v. Commonwealth*, Ky., 335 S.W.2d 556, 557 (1960), "the conditions were such that their connections would probably subconsciously affect their decision of the case adversely to the defendants"; and in *Marsch v. Commonwealth*, supra, 743 S.W.2d at

25

834, "their statements, given in response to leading questions, that they would disregard all previous information, opinions and relationships should not have been taken at face value." [Emphasis added.] *Pennington, Tayloe,* and *Marsch* stand for the principle that objective bias renders a juror legally partial, despite his claim of impartiality.

819 S.W.2d at 718. *Montgomery* addresses instances where the bias is clear and established, but the prosecution nevertheless asks questions aimed at having the jurors disclaim otherwise obvious bias. Here, on the other hand, bias has not been established. Defense counsel interpreted Juror 629's answers to mean that he would allow Sweet's failure to testify to influence his assessment of the case to Sweet's detriment, while the trial court and the Commonwealth interpreted Juror 629's answers to mean that he was concerned that Sweet would be unable to counter strong evidence against him if he does not testify. An attempt to resolve this ambiguity by calling Juror 629 to the stand would have been appropriate, but defense counsel refused.

Likewise, while Sweet is correct in his assertion that failing to remove a biased juror for cause when a reasonable person would view the juror as biased and thereby forcing a defendant to forfeit a peremptory strike makes the defendant take on the duty of the court and prevents him from getting the jury he had a right to choose, *see Shane,* 243 S.W.3d at 343, such is inapplicable here because bias has not been established. The trial court was justified in its decision that a reasonable person would not view Juror 629 as biased. Therefore, Sweet's use of a peremptory to strike Juror 629 did not deprive Sweet of any right.

26

## C. Allowing K.W.'s grandmother to sit with her during testimony was not reversible error.

Prior to K.W.'s testimony, the Commonwealth requested that K.W.'s grandmother, Janice, who was K.W.'s guardian at the time, be permitted to sit with K.W. during her testimony. The Commonwealth pointed out that the law provides for similar accommodations for juveniles and victim advocates, and that K.W. is perceived to be a vulnerable victim. Defense counsel objected out of concern that Janice "sitting next to her holding her hand" would cause the jury to perceive K.W. as so fragile as to be incapable of making decisions or talking without someone by her side. The trial court ruled that, due to K.W.'s intellectual disability, some accommodation was warranted to assist K.W. in testifying. Janice was permitted to sit near K.W. but was seated outside of the witness box and far enough away that she could not be seen on camera. Janice did not speak during the testimony and, outside of brief foundation during K.W.'s testimony identifying Janice as K.W.'s grandmother, Janice's presence caused no disruption to the proceedings. Sweet nevertheless argues that having Janice sit near the witness box made her appear more fragile and unduly bolstered her credibility, which Sweet argues was inherently prejudicial and created an unacceptable risk that the presumption of innocence would be eroded. *See Holbrook v. Flynn*, 475 U.S. 560, 567 (1986). Consequently, Sweet requests that his conviction be reversed.

Whether a right exists for an intellectually disabled adult to have their guardian with them for emotional support during their testimony at trial appears to be a matter of first impression in Kentucky. While Kentucky law

27

does allow for certain rights for victim advocates to accompany a victim on the witness stand, and accommodations are permitted for juvenile witness testimony, there is no statute, caselaw, or rule either explicitly allowing or disallowing a family member to accompany an adult victim with intellectual disabilities. KRS 421.575, which allows for accompaniment by a victim's advocate, provides:

> In all court proceedings, a victim advocate, upon the request of the victim, shall be allowed to accompany the victim during the proceeding to provide moral and emotional support. The victim advocate shall be allowed to confer orally and in writing with the victim in a reasonable manner. However, the victim advocate shall not provide legal advice or legal counsel to the crime victim in violation of KRS 421.570 and 524.130.

Notably, Sweet distinguishes victim advocates from Janice in that a jury would perceive a victim advocate as a professional, while Janice would not be so perceived.

The process for obtaining testimony from children who are the alleged victims of illegal sexual activity in the presence of a person there for the emotional support of the child is outlined in KRS 421.350(2). This provision allows, *inter alia*, upon motion of the attorney for either party and upon a finding of compelling need, the child's testimony to be given in a room other than the courtroom and the court to view that testimony by closed circuit equipment in the courtroom. Any person whose presence the court finds would contribute to the welfare and well-being of the child may be present in the room with the child during his or her testimony. Sweet contends that treating K.W. as a juvenile still would not allow Janice to sit near the witness

28

stand, even if the trial court had made a finding of compelling need, which Sweet argues was lacking in this case.

Rights of crime victims have recently acquired constitutional protections in Kentucky as a result of Marsy's Law. Section 26A of the Kentucky Constitution secures, *inter alia*, the right of the victim "to be heard in any proceeding involving a release, plea, sentencing, or in the consideration of any pardon, commutation of sentence, granting of a reprieve, or other matter involving the right of a victim other than grand jury proceedings," "the right to be present at the trial and all other proceedings, other than grand jury proceedings, on the same basis as the accused," and "the right to fairness and due consideration of the crime victim's safety, dignity, and privacy."

Since its ratification in November 2020, Section 26A has not been interpreted in a manner relating to intellectually disabled adults' right to have relatives or guardians sit near them during their testimony. Nevertheless, there is some case law providing guidance on how to weigh competing rights of victims to be considered in the criminal justice system with defendant's rights to a fair trial. *Cavanaugh v. Commonwealth,* 671 S.W.3d 17, 22 (Ky. 2022) made clear that "[t]rial courts must exercise great caution when balancing the rights of an alleged victim under Marsy's Law and the fundamental rights of the accused." *Robertson v. Commonwealth,* 677 S.W.3d 309 (Ky. 2023) held that the victim's constitutional right to be present for a trial trumps the defendant's statutory right to confrontation when that statutory right does not rise to the level of invoking the U.S. Constitution's confrontation clause, even

29

when this means that the victim is present for other witness testimony and then later gives their own testimony. Here, there is no explicit right for an intellectually disabled adult to have their guardian near them at the witness box, nor is there an explicit right of the defendant which prohibits the same.

Such a right on the victim's behalf, however, may be implied. The constitutional rights granted to victims would be meaningless in cases where the victim's testimony is vital to the prosecution's case, yet the victim's intellectual disability prohibits the victim from testifying against their alleged perpetrator absent reasonable accommodations. This is particularly relevant in cases involving sexual abuse where the evidence is often based predominantly on the victim's testimony. Defendants take their victim as they find them, and victims are guaranteed fairness and due consideration of their safety. Failing to provide reasonable accommodations to testifying victims would fail to grant due consideration to the victim's safety and well-being by potentially subjecting them to further trauma.

Nevertheless, Sweet fails to demonstrate how Janice's proximity to K.W. unfairly impacted his right to a fair trial. Sweet alleges that Janice's presence would impress upon the jury an image of a fragile victim who is unable to speak on her own. Yet, the jury had already been presented with evidence from K.W.'s former teacher that she functioned cognitively, socially, and adaptively the level of an eight- to ten-year-old child. The jury heard from multiple witnesses that K.W. liked to please people, did not like people to be upset with her, and was prone to manipulation. The jury heard evidence that K.W.

30

misread social cues and would never be able to live on her own. The jury watched a video-recorded interview at the police station between an officer, K.W., and K.W.'s mother in which her mother and the officer dominated the conversation. Sweet fails to demonstrate how Janice, sitting outside of the witness box, unduly prejudiced the jury.

Ultimately, in weighing K.W.'s need for reasonable accommodations against Sweet's right to a trial free from undue prejudice, we cannot say that the trial court abused its discretion in permitting Janice to sit near K.W. outside the witness box as K.W. testified. The trial court is affirmed.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. All concur with the exception of Part II (A) in which Keller, Bisig, and Goodwine, JJ., concur. Conley, J., concurs in result only by separate opinion which Lambert, C.J.; Nickell, and Thompson, JJ., join. Thompson, J., concurs in result only by separate opinion which Conley, J., joins.

CONLEY, J., CONCURRING IN RESULT ONLY: I agree with the Court's resolution in this matter, but I would hold that Sweet's jury instruction arguments were waived because he submitted jury instructions that contained the same errors he now complains of. The Court cites to *Quisenberry v. Commonwealth*, 336 S.W.3d 19 (Ky. 2011) for holding that our law makes a distinction between knowingly waived rights and unknowingly forfeited rights; the former being unreviewable and the latter subject to review. *Quisenberry*,

31

however, is not the last word on this subject and subsequent case law does not follow this distinction in cases such as this where the complained-of jury instructions are substantially similar to the ones Appellant proposed at trial.

Two years after *Quisenberry*, this Court held "if the instruction given was actually erroneous, Appellant not only failed to preserve the error by making the concern known to the trial court, he *invited* the error by affirmatively proposing an instruction that contains the very defect he now opposes." *Thornton v. Commonwealth*, 421 S.W.3d 372, 376 (Ky. 2013). A year later, citing *Thornton*, we held "palpable error review [is unavailable] when a party tenders instructions that are substantially similar to those ultimately given by the trial judge." *Webster v. Commonwealth*, 438 S.W.3d 321, 324 (Ky. 2014). *Webster* would explain, "our holding in *Thornton* regarding tendered instructions that are substantially identical to those given by the trial court is rooted in the concept of invited error." *Id.* Indeed, we apply this same rule in the civil context. *See e.g., Storm v. Martin*, 540 S.W.3d 795, 800 (Ky. 2017) ("Martin got nearly the exact jury instruction he proposed, and did not object to the instruction in the trial court. Martin cannot now make the unpreserved argument that error occurred in these instructions."). In *Rudd v. Commonwealth*, we held that an Appellant who "proposed a jury instruction on first-degree sexual abuse virtually identical to the one given by the trial court . . . . invited the error." 584 S.W.3d 742, 746 (Ky. 2019). We relied upon *Thornton* and *Webster* for that holding. *Id.* Finally, just a few months ago, we said in *Boggs v. Commonwealth*, that a defendant "knowingly relinquished the

32

right . . . . either by 'expressly agreeing' to the trial court's instructions . . . or by tendering 'instructions that are substantially similar to those ultimately given by the trial judge.'" No. 2023-SC-0467, __ S.W.3d __ (Ky. 2025), 2025 WL 1717814, at *4 (Ky. Jun. 20, 2025) (finality achieved 07/11/2025) (internal citations omitted).

Indeed, my position is nothing more than the position this Court has taken for a century.

> When a trial court adopts a party's proposed jury instructions, that party cannot be heard to complain that its 'substantial rights' have been affected by said instructions, nor that a 'manifest injustice has resulted from the error.' CR 61.02. This has been the law of this Commonwealth for decades. *See Chesapeake & Ohio Ry. Co. v. Boren,* 202 Ky. 348, 259 S.W. 711, 714 (1924). *See also Gibson v. Thomas,* 307 S.W.2d 779, 780 (Ky.1957) (finding error in interrogatories accompanying jury instructions not to be grounds for reversal because affected party proposed the instructions and interrogatories); *Wright v. Jackson,* 329 S.W.2d 560, 561–62 (Ky.1959) (same).

*Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 214 (Ky. 2012). The Court in *House of Imports* explicitly framed the invited error analysis in terms of our oft-quoted statement, that "a party cannot 'feed one can of worms to the trial judge and another to the appellate court.'" *Id.* at 214 n.6 (internal citation omitted).

I appreciate the majority reads language in *Quisenberry* and the Ninth Circuit that would support its conclusion, but the history of *Quisenberry*'s application by this Court is irrefutable: a defendant whose proposed jury instructions are substantially similar to the instructions given by the trial court is deemed to have invited any error said instruction may contain. The issue is waived under unambiguous and universal case law applying *Quisenberry*. It is

33

waived under a century's worth of precedent. This Court simply has never read *Quisenberry* in the manner it now proposes and such a reading at this point is highly anomalous. Such a ruling would introduce confusion and force lower courts to choose between applying this case or applying *Thornton, Webster,* and *Rudd.* Instead, we ought to follow the path we have consistently tread a century: a defendant waives any claim of error regarding jury instructions when he proposes jury instructions that are substantially similar to ones given by the trial court.

Lambert, C.J.; Nickell, and Thompson, JJ., join.

THOMPSON, J., CONCURRING IN RESULT ONLY: While I agree with the result of this appeal, I join Justice Conley in expressing my opinion that the invited error regarding jury instructions, where Gary Sweet's counsel submitted proposed instructions containing the errors, constitutes a waiver of any appeal regarding these instructions. I would therefore not review for palpable error. That does not mean, however, that Sweet would be wholly foreclosed from seeking any review.

Although the majority opinion engages in palpable error review of this issue on direct appeal, Sweet still has the option of pursuing a claim of ineffective assistance of counsel through Kentucky Rules of Criminal Procedure (RCr) 11.42. That is because "there are distinctions between palpable error under RCr 10.26 and the 'prejudice' requirement of *Strickland.*[5] This prevents

---

[5] *Strickland v. Washington,* 466 U.S. 668 (1984).

a palpable error analysis from being dispositive of an ineffective assistance claim." *Martin v. Commonwealth*, 207 S.W.3d 1, 4–5 (Ky. 2006). *See also Ford v. Commonwealth*, 628 S.W.3d 147, 159-160 (Ky. 2021) (following *Martin*).

To establish an entitlement to relief under *Strickland*, "[t]he defendant must show that: (1) trial counsel's performance was deficient, and (2) trial counsel's deficient performance prejudiced him." *Ford*, 628 S.W.3d at 156. "Thus, under *Strickland*, the petitioner must show both incompetence and prejudice." *Hatcher v. Commonwealth*, 310 S.W.3d 691, 696 (Ky. App. 2010).

Regarding this first prong, "[w]here the ineffective assistance of counsel claim is that counsel erred by failing to object to jury instructions . . . , it must first be shown that the jury instructions were given in error[.]" *Commonwealth v. Davis*, 14 S.W.3d 9, 11 (Ky. 1999). As the majority opinion stated, the instructions were given in error, so this is the law of the case, and this first test is thereby satisfied. I believe it is always error for counsel to propose or agree with clearly improper instructions that make it *easier* to convict a defendant; that cannot be a matter of trial strategy. *See, e.g., Hatcher v. Commonwealth*, 310 S.W.3d 691, 699-702 (Ky. App. 2010).

Whether Sweet can establish in an RCr 11.42 action that he was prejudiced by receiving erroneous instructions under the second prong of *Strickland* is a question that is not before us. Therefore, I would affirm but for different reasons regarding the jury instruction issue.

Conley, J., joins.

COUNSEL FOR APPELLANT:

Katherine Kallaher Schmidt
Erin Hoffman Yang
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Jenny Lynn Sanders
Assistant Attorney General